Benjamin Ellison appearing for appellants, Beth Levine appearing for appellee. All right. Good morning, Mr. Ellison. As you get to the podium, let me know about how much time you would like to reserve. Your Honor, I'd like 13 minutes for argument, and I'd like to reserve 2 minutes for rebuttal, please. All right. You may begin. Good morning, Your Honor. Ben Ellison for the debtor and appellant Olivier Ringon here. Mr. Ringon, together with his wife, was prosecuted by the United States Trustee's Office under 727A2, A3, A4, A5, and A7. Though originally there were five theories asserted against my client, and to be clear, I'm only representing Mr. Ringon here today, not Mrs. Kwang, despite the fact that there were five causes of action initially brought against Mr. Ringon. Ultimately, he prevailed on two, or pardon me, there was liability found only on three, A3, A4, and A5. I would just have perhaps this one opening remark that I would make before hitting what I think are sort of the five basic disagreements on the facts and the law in this case. I guess I just wanted to say that I think it's a matter of public record that the United States Trustee's Office has a success rate of 99% when it comes to 727 actions. That somewhat flies in the face of the rote black-letter law that we have from, I think it's Beauchamp and other cases that says, discharges are to be liberally construed in favor of debtors and strictly against the person objecting to the discharge. We have this case law that pays lip service to this burden. I think we need to get to the actual merits of your case. We're not going to get into the statistical analysis of the success rates. You can begin by addressing the effect of the community property nature of the case and how that impacts. We're aware that you raised Barton-Werfer in your briefing. Don't really see it as a Barton-Werfer situation. I'm afraid that we're sliding towards Barton-Werfer in 727. I don't think so here because I think we read the decision from the bankruptcy judge as focusing on what Mr. Ragone did. That's what their briefing is directed to and that's what it should be. But there's a community property situation. My understanding is there's no dispute that this is community property. So while much of the items that are in dispute arose initially with Ms. Kwan as the wife, it's still the husband's property as well, which expands somewhat the obligations under 727. So I would urge you to start there. I suppose, Your Honor, I would say that community property, I think, cuts in favor of my client because right off the bat, clients such as mine have imputed liabilities through their spouses in this state. But what we're talking about here is discharge, which is 727. What we're talking about is nondisclosure of assets, really, whether it was concealed, whether it was fraudulent, or whether it was a false oath. Correct. And none of those things have to do with anything other than the strictures of 727. They aren't. I mean, I guess my question is if you could apply the community property presumption to a specific class of assets, I could perhaps address it there. But I feel like over and over again there's just been this conflation of Ms. Kwan, we adequately made out a case against her, and it's just the language. The question is did he have an independent duty to disclose information because he had an ownership interest in it, or was it her separate property so his failure to take action would be excusable because he wouldn't be expected to? That's the problem, Your Honor. He didn't have an ownership interest. Well, that's why the community property question was raised, because the presumption is everything that they acquired during the marriage, which is most of the assets in this case that were at issue, were acquired after 2016. I understand. But in 2015, that's when ROC-PI was created. So ROC-PI was created by Mrs. Kwan, and then later they get married. So what was hers remains hers. That's her pre-marriage separate property. It wasn't clear that we were referring.  ROC-PI. And ROC really doesn't play into this. When you play it through, ROC owned the Denny properties. The Denny properties were then transferred. To her. In the few tax returns that are presented, there's a 2017 tax return that shows the rent of the Denny properties, and they were not disclosed. I agree they weren't disclosed. And community property has nothing to do with knowledge or imputing knowledge. It has to do with ownership and responsibility. It was on the 2017 tax return. What was on the term? For them. The rental of the three Denny properties. Yes, it was. So he had an interest in it. He benefited from the income from it. He didn't make any effort to disclose it. And he'd have to explain what happened to them. But you would need to establish that he had knowledge of it. No. I don't think that's where we're having the problem. If it's your property and you file bankruptcy, 727 is going to require you to do some preparation to explain what happened in any questions and to disclose any of the transactions that fall within the financial affairs time period. I suppose the disconnect that we're having here is in many, many couples, there are people who specialize in certain areas of the family business. So running the properties might be one issue, but the income that was generated from them went through their bank account. He spent the money. So how did he not have knowledge of the income that was being generated, whether he owned the properties, managed the properties or not? The premise of the question is incorrect. You said that he spent the money. He didn't spend the money. If we look at page 48 of the appellee's brief, it states that Mr. Ragone had the benefit of $25,000 for some sand property and bamboo investment. And they say that he had access to the bank account. He had electronic access. And if we turn to page 15 of the judgment, the court also says that. The court also says that Mr. Ragone had electronic access. But if you read the actual testimony, it doesn't say that. It says only Mrs. Kwan had electronic access. Perhaps I could just give you. Let's be specific. This is as to the sand properties. I think this is to all bank accounts. No, it's not to Rock. What I'm saying is Mr. Ragone didn't have electronic access to the bank accounts. So every time there's a question as to. He did not have access to the Rock accounts from which I thought the testimony was that he paid bills and monitored. And he did not have access to the checking account or the savings account. My answer to that is yes. And let me just clarify it with the page citation that I would point the court to. And this is the problem, right? If the court's judgment on page 15 is that he had full and unfettered access to these accounts, then I absolutely concede that this is all imputed to him. And he should have the knowledge. But I think that's where the fundamental disconnect. How about the problem that the court determined that they thought his feigned ignorance was not credible? Your Honor, I understand about the feigned ignorance. And I am going to address that comprehensively. Could I answer? Could I give the citation to Judge Spraker and then provide the answer on the feigned ignorance? Because I think it's a good point. It's the point I have to overcome to prevail of several. So on day three of testimony, on pages 106 to 107, Mr. Ragone clarified what had been his prior testimony. His prior testimony, he was asked, did you make electronic payments with the bank account? And he said yes previously. However, on page 106 to 107 of the third day of testimony, he clarified under Cross that, in fact, he did not access the bank account. What he would do is he would go to a utility bill, and he would write in the account number for the bank account. So he's making passive withdrawals. He's not going to the bank account. He's not monitoring it. But he has a number. He knows that it exists, and he's utilizing it for his own benefit, doesn't disclose it on his schedules. He has the bank account number, and I would submit that that is insufficient to create liability for him, other than knowing that there's a bank account there. He's not getting active updates. He's not able to move the money out. He can provide the bank account information to creditors, and they can, in the regular course of business, pull things out. Could I address your question about the credibility? Sure. Mr. Ellison, let me just ask a question on this one. Isn't that a question of fact, and isn't that something that Judge Alston had the ability to decide? Are you saying that as a matter of law or that it was clear error for him to have decided this access issue against your client? Yes, he has it factually wrong. On page 15 of the judgment, he says that Mr. Ragone had electronic access to the bank account. I could find the specific quote, but it's effectively that he had control over the electronic access to the account. But I'm saying that on page 106 to 107 of the third day of testimony, the undisputed testimony is that he did not. He did not have any active access of the bank account. All right. Go ahead. To answer your question about credibility, Judge Alston is very good at making credibility determinations, and he made three. They're on page 14 and page 16 of the judgment, and he states that Ms. Kwan lacks credibility three times. And then there is this one instance where I believe the language is the debtors lacked, no, feigned ignorance. Okay. I guess I would say that credibility determinations are entitled to a substantial amount of deference, but much like business judgment, there needs to be an articulated rationale or some kind of specificity. I would merely point out that in the quotation that you cite, which is the only impugning of Mr. Ragone's credibility, he's not named. There's just that plural noun, defendants or debtors, feigned ignorance. Okay. We don't know who's feigning. We don't know what they're feigning about. And I would further point out that it sounds like a general attack on Mr. Ragone's credibility. On page 48, I believe, of the Pelley brief, it makes it sound like there is this wide attack on Mr. Ragone's credibility, but the end part of the feigned ignorance sentence relates just to the trust, the Kwan irrevocable trust. So there is a vague reference, I would say a generalized reference to lacking credibility by two people on one particular asset, but nowhere else across the board is there any of this. I see that my time will eventually run out. Can we talk about the trust just a little bit because that's a fairly significant matter? Mm-hmm. Is there a dispute that Mr. Ragone was the beneficiary of a trust? There's no dispute about that. So that should have been disclosed. I'm not sure that it should have. It's an irrevocable trust for which he's a beneficiary? It's not an asset? He is the beneficiary of a trust. He's not aware that he is the beneficiary. He is at an initial meeting when his wife is traveling to Texas. He's at a meeting where— And again, to Judge Brand's point, isn't that a factual determination? Didn't Judge Alston find that he was? Yeah, he found that he was present. He found that he was present there, and he also found that he was a beneficiary of the trust. But again, it is the Quan Irrevocable Trust. It is not the Ragone Irrevocable Trust. I'm the beneficiary of documents all over the place. If you file bankruptcy, you should probably disclose that. I absolutely will in front of Judge Alston and in the Ninth Circuit. I guess I'm saying I see that I'm running low. I'm going to just take one more minute, and I guess I just want to— You can address it in reply. There's three manners in which my client losses discharge, A3, A4, and A5. It may not seem extremely relevant, but my client has also had a professionalism complaint lodged against him with the police department. And the more specific and narrow what happened can be, the better it could be for him professionally. So I can understand that if we only prevail on A4 but not A5, there could be a certain mootness to this, and there would be no need to wade into the weeds as to whether all the dots have been connected. But on my client's behalf, I would ask that if there's any causes of action upon which we do prevail, we would appreciate it to have some sort of affirmative finding for that so that we could use it in whatever administrative proceedings. Thank you. Thank you. Thank you. May it please the Court. Beth Levine with the Department of Justice for the United States First State. We're here today, as you know, because the Bankruptcy Court denied a discharge to Mr. Regone. It also denied it to his wife, but she is no longer appealing. To receive a discharge, debtors must be transparent. They have an obligation to keep records regarding their assets and explain where the assets went. The Chapter 7 trustee and the creditor shouldn't be forced to engage in an expensive investigation. It shouldn't be like pulling teeth to get information, but in this case it was. What was a first for the Chapter 7 trustee, he had to continue the 341 meeting 10 times for a total of 11 meetings and has struggled to obtain information. Many assets weren't disclosed until subpoenaed, and much information was only disclosed by third parties. The Bankruptcy Court here had three independent bases for denying Mr. Regone a discharge. Go ahead. It is an interesting development for Ms. Kwan to no longer contest the appeal. In reading the evidence and the Bankruptcy Court's decision, there is a blurring of the individual estates, the individual debtors, into, understandably, a couple. And Mr. Ellison made that reference that some of it is just debtors as to the credibility, as to assets, as to payments. Now that we have to separate that and really examine Mr. Regone separately, it seems more difficult. So a lot of the acts done by Ms. Kwan, but now we have to assess Mr. Regone's disclosure obligations and his compliance with 727. That seems a little more difficult. Can you address the exact conduct by which gives rise to each of these obligations under 3, 4, and 5? And how they were violated. I'd be happy to, Your Honor. And first of all, I'd like to make the point that, you know, as has been noted, this is a clearly erroneous standard. And the Bankruptcy Court here, when it intended to refer just to Ms. Kwan, it did. When it intended to refer just to Mr. Regone, it did. And when it intended to refer to them both, it referred to defendants. But I don't think it can be assumed that when it referred to defendants, it was not doing that intentionally and intentionally including Mr. Regone. Well, there is some of that, you know, in the discussions of the income from the trust. It's Kwan, Kwan, Kwan, Kwan and Regone. So as for that, you're asking to deny the discharge for a joint payment of $2,500 roughly. And I think that's what we're alluding to. Can you help us understand that and the basis? Because when you parse it that thin, it feels like a much different case. Sure. Why don't I start with Section 727A4, that he made fraudulent false oaths. And as the Court has acknowledged, this was not a Barton-Murphy imputation. The Bankruptcy Court made findings that Mr. Regone himself made fraudulent false oaths. And, of course, fraud is often, is usually based on circumstantial evidence, things like the number of omissions, the failure to correct them, the size of the omissions. All of those badges of fraud are true here with respect to Mr. Regone. So there were at least six material omissions, starting with the sale of the three Denny properties. Mr. Regone admitted he knew about those sales. That's at 30 SCR 488A. He claimed he didn't know who owned the properties, but he knew of the sales. And, of course, when you sign the schedules, they specifically say when you're filing jointly with a spouse, you are equally responsible for ensuring their accuracy. And the notion that he didn't know that he owned it is directly contrary to the fact that they personally used those funds. And that gets to the next significant omission. They personally used the funds. Where is the evidence that he personally used the funds from the Denny sales? Sure. So there's $48,000 that went to their joint checking account. And Ms. Kwan testified that they had long discussions about what to do with that money. Should they use that money to stay at foreclosure of their home? Or should they use that money to put it into their business? That discussion lasted for days with Mr. Regone. So he very much knew that this money from the Denny property was going to be used for personal expenses. That is in the record that Ms. Kwan's testimony about those extensive discussions at 29 SCR 460-61. Let me bring it back to the false oath then. Sure. What is the exact false oath in not disclosing the use of the Denny properties? Because there's the dispute as to what he knew who owned. So how it gets there seems to be in some flux. And maybe Judge Alston, you know, decided that's a factual matter. Okay. But then there's the use of that and ultimately the false oath that arises. So where is that false oath?  So there are two false oaths related to the Denny properties. The first is SOFA question 18 that asked about sales of property. The second is income, the proceeds from the Denny sales. That's question 5 of the SOFA. And he knew about that income, having personally used it and discussed how to use it. There's also a false statement regarding income, the same question SOFA 5, regarding the $25,000 from the Sands property. Mr. Ragone never denies knowledge about the Sands properties. There's no testimony denying knowledge of it. There was a 5% interest in the Sands properties disclosed in the schedules. The $25,000 from the Sands property went into the joint checking account. And five $5,000 installments in the four months before they filed a petition. The last one, just a week before they filed their petition. And to address the claim that Mr. Ragone did not have access to the online bank accounts, Mr. Ragone testified that he did. That's at SCR 482-483. And I can read that. What I neglect, this is starting at page 482, it's transcript page 69, line 24. What I neglected to ask you, but meant to ask you, is did you also have online access to your personal accounts? Answer, yes. The testimony that Mr. Ellison referred to had to do with his practice for paying the bills. It was not that he didn't have access to the accounts. So those are, depending on your count, three or six false statements already. Then you have the failure to disclose the Bank of America account. That was account. The Bank of America savings account. The savings account, yes. Correct. Because the Bank of America checking account was disclosed. That joint account was disclosed. The savings account was not disclosed. And, of course, banking accounts are always very important in a bankruptcy. And what was the size of the savings account? I believe it was something less than $1,000. But the law is well established that disclosure of accounts is important. You can understand why. To look at past transactions to make sure that debtors are not secreting assets. Doesn't that really ultimately get to the fraudulent intent? I'm sorry. I couldn't quite hear you. Doesn't it ultimately get to the fraudulent intent? Yes. If you disclose Bank of America checking and you omit a $1,000 Bank of America savings, why is that fraudulent? Why is that a false oath instead of a mistake? Because they did not amend it, I believe, is really correct. That is part of it, yes. They did not amend it. And it's also, as mentioned, when courts evaluate whether there's fraudulent intent, they look at, for example, the number of material omissions. And there were many here. We haven't even gotten to the trust and to the AIG policy, which involved hundreds of thousands of dollars of transactions. Over $100,000 went from Mr. Ragone and his wife to the trust. Wait. Went from Mr. Ragone and the trust. It went from the checking account? It went from the checking account or their business account. Or their business. The business being Crystal? The business being Rock PI. And it was funneled through that entity, Crystal. All right. And who transferred the money? Your Honor, Ms. Quantas, she transferred the money from Crystal, but it originated in accounts to which Mr. Ragone had online access. And, again, this is the credibility finding with respect to the trust, that Mr. Ragone was feigning ignorance about it. He testified he was present when the trust was created. In 2017 or 2016, right? In 2016. At the first meeting. In 2019, I believe it was 2019, there was a check made out to both of them. He was on. What happened to that check? Where is the information regarding where was it deposited, where was it cashed? Your Honor, the fact that we don't know, that is all part of the A3 and the A5 basis for denial of discharge. Your Honor, so all of these omissions, the number of them support the finding of fraudulent intent, as does the court's credibility finding that Mr. Ragone feigned ignorance, as does the timing, for example, the money that was deposited just before they filed for bankruptcy, as does the fact that he did not correct these omissions even when he knew about them. They filed amended schedules. There was no correction there. He continued to swear under oath that they were true and correct. There was no correction in the two years between the petition and the trial, despite the many, many requests for information about these transactions, despite the complaint, despite the amended complaint, there was still no correction. It was very much like the Ninth Circuit's Retz case. Just like as there, the court did not clearly err in finding fraudulent intent based on what was, Mr. Ragone, at best, reckless indifference to the truth, the significant number of falsehoods and omissions, and the failure to amend in those two years. Would an amendment have corrected anything? Would it have changed the fraudulent intent? Your Honor, I— Fraudulent intent is measured at the time of the act, right? Fraudulent intent is measured at the time of the act. The evidence of it can include, as the Retz court held, the failure to amend, and he continued to make false oaths in the amended schedules at the 341 meeting. Go ahead. Well, I was going to ask, does the failure to amend also affect the 727.85 requirement that you have up until the time the discharge is denied to correct any or explain any loss of assets? And no amendment means once he was aware that there was a problem, right? He still failed to provide that satisfactory explanation. That's absolutely right. And we haven't gotten, really, to A3 or A5. There was no satisfactory explanation, as you pointed out, for all the money that was funneled into the trust or what the trust did with it or the money that went to the AIG policy. There was no satisfactory explanation. But to be clear, he was required to give that satisfactory explanation because it went through the joint checking. The trust was an asset that he was required to disclose, and there was money that was spent by the trust. There was money that was spent by him that went to the trust, and there's no adequate explanation for what happened to those funds. There's no adequate explanation for what happened to the reduction of interest in the SANS entities. One of them started out with a 50 percent interest. One of them started out with a 25 percent interest. They each were reduced to 5 percent. There's no dispute that there was not an adequate explanation. There's no dispute that there was a loss of assets here, and the burden shifted to Mr. Ragone. It was his burden to come forward with a satisfactory explanation, and he didn't. Is there a difference in the A5 requirement for intent than there is under the A4 or A3? Absolutely. And I was just about to get to that. There is no intent requirement for A5. There is no intent requirement for A3. A5 requires only that the debtor come forward with a satisfactory explanation, and here the debtor did not. It was his burden to do so, and this is like the First Circuit case in Simmons. In that case, the debtor claimed he was a dupe, and the court said that that assertion of ignorance provides no explanation at all. That is the same here. And, again, with respect to the trust, great deference is owed to the bankruptcy court's credibility finding that Mr. Ragone was feigning ignorance about that. With respect to A3, that is another third independent basis for the denial of discharge. It is undisputed that there were inaccurate records regarding that $25,000 received from the Sands Holdings Company. We don't know if it was a loan. We don't know if it was a distribution. We don't know what it was. There's admittedly no records regarding the EIG policy for which Mr. Ragone was the beneficiary. There are inadequate records regarding all these transactions with the trust, and Mr. Ragone failed to file his tax returns in 2018 and 2019 and 2020. The 2018 returns were eventually filed, we understand, but not the 2019 and 2020, and it was stipulated that he never produced any signed returns. Again, intent is not an element. The burden shifted to Mr. Ragone to provide a sufficient justification for the lack of records. The standard of whether a reasonably prudent person in similar circumstances would do so, and he presented no evidence to carry his burden. He did not present any evidence that a debtor in like circumstances would not have filed tax returns, and the evidence in the record is to the contrary. The Chapter 7 trustee testified that he's seen debtors in like circumstances who had filed their tax returns. That's in the record at 31 SCR 518 to 519. I only have a few seconds left, but with respect to the other properties, again, he comes forward with an ignorance defense. The court didn't believe he was ignorant, but this case is a striking contrast to the Cox case in the Ninth Circuit, and we talked about that at pages 40 and 42 of our brief. I have about 10 seconds left, so with that, I'll just ask if you have any additional questions. And Judge Brand, any questions? Thank you. For all of those reasons, Your Honors, we ask that you affirm. Thank you very much. Mr. Ellison, you have about a minute 45. Thank you, Your Honor. There is the generalized, I would say generic statement about Mr. Ragone's lack of credibility, but it was limited to the context of the trust. I will say that during his day of testimony, day three, he stated 13 times that he wasn't aware because these questions related to financial duties and obligations that his wife was primarily aware of, and he did not know the answer. It cannot be that we discredit page 51, 52, 3, 59, 68, 73, 77, 84, because there's not been particularized rejection of his credibility on these points on all matters. The second thing I would say is I dispute the UST's distinction on whether there's control over the bank account. On page 10, the statements provided by the UST are accurate. Her citation is correct, but the citation we provided came afterward and clarified what had happened there. And I would just give the Court this one sentence from page 106 from day three of the testimony. This is my question. All right. I think there was some question about your level of involvement, Mr. Ragone, in making payments. I think we heard that you would be on job sites and hand over checks. Were you actively going into the online bank accounts for ROC-PI? Answer, no. What goes on over the next two pages further clarifies that he only has passive access and passive representative capacity with regards to the account. He's not going in. He's not spending the money. The last thing I'll say is just the UST said, with regards to sand properties, no testimony was provided by Mr. Ragone that he denied what he – to what point did Mr. Ragone deny having knowledge about what was going on there? I think what's relevant is that no one asked Mr. Ragone any questions about sand properties, neither ourselves nor the UST. So we just have all these dots, and it's up to the UST to connect them, and I don't think sufficient dots have been connected. Thank you very much. All right. This matter will be submitted. Thank you for your very interesting and good arguments. It will be submitted. We'll get it out of order as soon as possible, decisions as soon as possible.
judges: Brand,Spraker, Gan